JOHNSON FISTEL, LLP
Frank J. Johnson, Esq. (SBN 174882)
FrankJ@johnsonfistel.com
Brett M. Middleton, Esq. (SBN 199427)
BrettM@johnsonfistel.com
Kristen L. O'Connor, Esq. (SBN 305113)
KristenO@johnsonfistel.com
655 West Broadway, Suite 1400
San Diego, CA 92101
Telephone: (619) 230-0063
Facsimile: (619) 255-1856

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SONNY MCPHERSON, Derivatively on behalf of ACTIVISION BLIZZARD, INC., <br><br> Plaintiff, <br><br> vs. <br><br> ROBERT A. KOTICK, SPENCER NEUMANN, COLLISTER "CODDY" JOHNSON, REVETA BOWERS, ROBERT J. CORTI, HENDRIK J. HARTONG III, BRIAN G. KELLY, BARRY MEYER, ROBERT MORGADO, PETER NOLAN, CASEY WASSERMAN, and ELAINE WYNN <br><br> Defendants, <br><br> -and- <br><br> ACTIVISION BLIZZARD, INC., a Delaware corporation, <br><br> Nominal Defendant. | Case No. 2:19-cv-04861-SVW-AFM <br><br> *Assigned for All Purposes to the Honorable Stephen V. Wilson* <br><br> AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT <br><br> **DEMAND FOR JURY TRIAL** <br><br> Date Action Filed:   June 4, 2019 |

# TABLE OF CONTENTS

**Page**

I.  NATURE AND SUMMARY OF THE ACTION ........................................ 1

II.  JURISDICTION AND VENUE ............................................................... 4

III.  THE PARTIES ...................................................................................... 5

IV.  SUBSTANTIVE ALLEGATIONS .......................................................... 8

    A.  Background Of Activision ......................................................... 8

    B.  The Individual Defendants Caused Activision To Make Improper Statements During The Relevant Period ........................... 12

V.  THE TRUTH EMERGES ..................................................................... 16

VI.  DUTIES OF THE INDIVIDUAL DEFENDANTS ................................. 18

    A.  Fiduciary Duties ..................................................................... 18

    B.  Audit Committee Duties ......................................................... 19

    C.  Duties Pursuant To The Company's Code Of Conduct And Corporate Governance Principles ........................................... 21

    D.  Control, Access, And Authority ............................................. 22

    E.  Reasonable And Prudent Supervision .................................... 23

VII.  BREACHES OF DUTIES ..................................................................... 24

VIII.  CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION .............................................................................................. 24

IX.  DAMAGES TO THE COMPANY ........................................................ 25

X.  DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS ................. 26

    A.  Demand Is Futile As To All Director Defendants Because The Director Defendants Face A Substantial Likelihood Of Liability ...... 27

    B.  Demand Is Futile As To Audit Committee Defendants .................... 30

    C.  Demand Is Futile As To Kotick For Additional Reasons .................. 32

    D.  Demand Is Futile As To Kelly For Additional Reasons .................... 33

    E.  Demand Is Futile As To All Director Defendants For Additional Reasons ............................................................................... 34

i

COUNT I ....................................................................................................... 36

    Derivatively For Contribution Under Sections 10(B) And 21D Of The
    Exchange Act Against The Securities Class Action Defendants ................. 36

COUNT II ..................................................................................................... 37

    Against The Individual Defendants For Breach Of Fiduciary Duty For
    Disseminating False And Misleading Information ..................................... 37

COUNT III .................................................................................................... 38

    Against The Individual Defendants For  Violations Of Section 29(B) Of
    The Exchange Act ....................................................................................... 38

COUNT IV .................................................................................................... 39

    Against All Individual Defendants For Abuse Of Control ........................... 39

COUNT V ...................................................................................................... 39

    Against All Individual Defendants For Gross Mismanagement ................... 39

COUNT VI ..................................................................................................... 40

    Against All Individual Defendants For Waste Of Corporate Assets ............ 40

COUNT VII ................................................................................................... 40

    Against All Individual Defendants For Unjust Enrichment .......................... 40

PRAYER FOR RELIEF ................................................................................ 41

JURY TRIAL DEMANDED .......................................................................... 42

AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

By and through his undersigned counsel, Plaintiff Sonny McPherson ("Plaintiff") brings this shareholder derivative action on behalf of Nominal Defendant Activision Blizzard, Inc. ("Activision" or the "Company") against certain current and/or former officers and directors of the Company for violations of law, including breaches of fiduciary duties, unjust enrichment, and corporate waste, from at least August 2, 2018 through the present (the "Relevant Period").

Plaintiff makes these allegations upon personal knowledge as to those allegations concerning Plaintiff and, as to all other matters, upon the investigation of counsel, which includes, without limitation: (a) review and analysis of public filings made by Activision and other related parties and non-parties with the U.S. Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by certain of the defendants and other related non-parties; (c) review of news articles, shareholder communications, and postings on Activision's website concerning the Company's public statements; (d) publicly available pleadings, papers, and court documents, including any documents filed with and publicly available from the related pending consolidated securities fraud class action, *In Re: Activision Blizzard, Inc., Securities Litigation*, MDL No. 2891 (C.D. Cal.) (the "Securities Class Action"); and (e) review of other publicly available information concerning Activision and the Individual Defendants (defined below).

## I.    NATURE AND SUMMARY OF THE ACTION

1.    Activision is a global entertainment corporation that develops and distributes content and services for video game consoles, handheld platforms, personal computers, and mobile devices.  According to public filings, over 350 million monthly active users ("MAUs") consume the Company's entertainment content every month, in more than 15 countries around the world.  Activision's portfolio of interactive entertainment includes popular franchises such as *Call of Duty*, *World of Warcraft*, *Candy Crush*, and until recently, *Destiny*.

2.     The commercially successful *Destiny* franchise, a series of science fiction-themed video games, was developed through a partnership between Activision and Bungie, Inc. ("Bungie"), the developer of blockbuster game franchises including *Halo, Myth,* and *Marathon.*   On April 29, 2010, the Company, through its wholly owned subsidiary Activision Publishing, Inc. ("Activision Publishing"), entered into a partnership agreement (the "Partnership Agreement") with Bungie.  The Partnership Agreement gave Activision exclusive rights to publish and distribute video games developed by Bungie for the next ten years.

3.     Activision released *Destiny* in September 2014 as the first installment in the franchise.  At the time, *Destiny* was the largest video game franchise launch in history, with the Company selling $500 million of *Destiny* into retail stores and first parties worldwide on the first day of its release.

4.     Over the following two years, Bungie developed four expansions for *Destiny*, which Activision then distributed pursuant to the Partnership Agreement.  In September 2017, Activision released a full sequel, *Destiny* 2.  On September 15, 2017, Activision announced that *Destiny* 2 had "surpassed the original's records for engagement and digital sales in launch week."  To date, Bungie has developed, and Activision has released three expansions for *Destiny* 2.

5.     During the Relevant Period, the Individual Defendants repeatedly assured investors that the Company's growth and revenues would continue throughout 2019 and beyond, based in part on Activision's partnership with Bungie.

6.     On January 10, 2019, Activision and Bungie shocked the market when they announced the end of their business relationship.  In a post on its website entitled "Our Destiny," Bungie stated, in relevant part[1]:

> We have enjoyed a successful eight-year run and would like to thank Activision for their partnership on Destiny.  Looking ahead, we're excited to announce plans for Activision to transfer publishing rights for Destiny to Bungie.  With our remarkable Destiny community, we are

---

[1]  Unless otherwise noted, any emphasis in the quoted material in this Complaint has been added by Plaintiff.

AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

ready to publish on our own, while Activision will increase their focus on owned IP projects.

***The planned transition process is already underway in its early stages***, with Bungie and Activision both committed to making sure the handoff is as seamless as possible.

7. That same day, in a current report filed on Form 8-K with the SEC, Activision stated that Bungie would "assume full publishing rights and responsibilities for the Destiny franchise," and that consequently, the Company did not expect any material revenues from the *Destiny* franchise in 2019.

8. As a result of these revelations, the Company's stock price fell $4.81 per share, or 9.37%, to close at $46.54 on January 11, 2019. In the weeks that followed, Activision's stock continued to fall, dropping to close at only $40.11 per share on February 11, 2019.

9. During the Relevant Period, the Individual Defendants caused the Company to issue false and misleading statements concerning the Company's business, operational, and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the termination of the Partnership Agreement was imminent, and Bungie would assume full publishing rights and responsibilities for the *Destiny* franchise; (ii) the termination of the Partnership Agreement would foreseeably have a significant negative impact on Activision's revenues; (iii) as a result, Activision's growth and revenues would be adversely affected; and (iv) Activision lacked adequate internal controls.

10. As a direct result, Activision has been, and will continue to be, damaged by the Individual Defendants' breaches of fiduciary duties and improper conduct.

11. The Activision Board has not commenced, and will not commence, litigation against the Individual Defendants named herein, let alone vigorously prosecute such claims, because, among other things, a majority of the members of the Board are directly interested in the personal financial benefits challenged herein, that were not shared with Activision shareholders, and/or face a substantial likelihood of

liability to Activision for breaching their fiduciary duties of loyalty, good faith, and candor by authorizing or failing to correct the false and misleading statements alleged herein, and/or lack independence.

12.     Accordingly, a pre-suit demand upon the Board was, and is, a useless and futile act.  Thus, Plaintiff rightfully brings this action to vindicate the Company's rights against its wayward fiduciaries and hold them responsible for the damages they have caused to Activision.

## II.   JURISDICTION AND VENUE

13.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 in that this action states a federal question.  Plaintiff has asserted a federal claim of contribution derivatively on behalf of the Company, arising under Sections 10(b) and 21D of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78u-4.  Pursuant to federal statutory law, this Court has original federal question jurisdiction over the federal contribution claim.

14.     This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367.

15.     This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

16.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

17.     Venue is proper in this Court in accordance with 28 U.S.C. § 1391 because (i) Activision maintains its principal executive offices in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein occurred in this District; and (iv) the Individual Defendants have received substantial

1  compensation in this District by doing business here and engaging in numerous
2  activities that had an effect in this District.

3  ### III.    <u>THE PARTIES</u>

4      18.    Plaintiff Sonny McPherson is a current shareholder of Activision and has
5  continuously held the Activision common stock since August 3, 2017.

6      19.    Defendant Activision is a Delaware corporation with its corporate
7  headquarters at 3100 Ocean Park Boulevard, Santa Monica, California 90405. The
8  Company's common stock trades on the NASDAQ Global Select Market
9  ("NASDAQ") under the ticker symbol "ATVI."

10     20.    Defendant Robert A. Kotick ("Kotick") has been the Company's Chief
11 Executive Officer ("CEO") and director since February 1991. Kotick was also the
12 Company's Chairman from February 1991 to July 2008 and was the Company's
13 President from July 2008 to June 2017. Kotick is named as a defendant in the
14 Securities Class Action. Kotick received total compensation from Activision of
15 $30,841,004 in 2018.

16     21.    Defendant Spencer Neumann ("Neumann") was the Company's Chief
17 Financial Officer ("CFO") from May 2017 until he was terminated by the Company
18 for cause as of December 31, 2018. Neumann is named as a defendant in the Securities
19 Class Action. Neumann received total compensation from Activision of $6,738,174
20 in 2018.

21     22.    Defendant Collister "Coddy" Johnson ("Johnson") has been the
22 Company's President and Chief Operating Officer ("COO") since June 2017. Johnson
23 is named as a defendant in the Securities Class Action. Johnson received total
24 compensation from Activision of $8,171,121 in 2018.

25     23.    Defendant Reveta Bowers ("Bowers") has been a director of the
26 Company since January 2018. During the Relevant Period, Bowers was a member of
27 the Compensation Committee. Bowers received total compensation from Activision
28 of $470,239 in 2018.

24.    Defendant Robert J. Corti ("Corti") has been a director of the Company since December 2003.  During the Relevant Period, Corti has been the Chair of the Audit Committee.  Corti received total compensation from Activision of $379,713 in 2018.

25.    Defendant Hendrik J. Hartong III ("Hartong") has been a director of the Company since July 2015.  During the Relevant Period, Hartong has been a member of the Audit Committee.  Hartong received total compensation from Activision of $350,713 in 2018.

26.    Defendant Brian G. Kelly ("Kelly") has been the Company's Chairman of the Board since October 2013 and has been a director of the Company since July 1995.  Kelly was also the co-chairman of the Board from October 1998 until October 2013.  Kelly received total compensation from Activision of $489,713 in 2018.

27.    Defendant Barry Meyer ("Meyer") has been a director of the Company since January 2014.  During the Relevant Period, Meyer was a member of the Nominating and Corporate Governance Committee.  Meyer received total compensation from Activision of $345,213 in 2018.

28.    Defendant Robert Morgado ("Morgado") has been a director of the Company since February 1997.  During the Relevant Period, Morgado has been the Chair of both the Compensation Committee and the Nominating and Corporate Governance Committee.  Morgado received total compensation from Activision of $448,546 in 2018.

29.    Defendant Peter Nolan ("Nolan") has been a director of the Company since October 2013.  During the Relevant Period, Nolan has been a member of the Audit Committee.  Nolan received total compensation from Activision of $347,963 in 2018.

30.    Defendant Casey Wasserman ("Wasserman") has been a director of the Company since July 2015.  During the Relevant Period, Wasserman has been a

member of the Nominating and Corporate Governance Committee.  Wasserman received total compensation from Activision of $345,213 in 2018.

31.   Defendant Elaine Wynn ("Wynn") has been a director of the Company since October 2013.  During the Relevant Period, Wynn has been a member of the Compensation Committee. Wynn received total compensation from Activision of $345,213 in 2018.

32.   Defendants identified in ¶¶ 20–31 are sometimes collectively referred to herein as the "Individual Defendants."

33.   Defendants Kotick, Bowers, Corti, Hartong, Kelly, Meyer, Morgado, Nolan, Wasserman, and Wynn are sometimes collectively referred to herein as the "Director Defendants."

34.   Defendants Corti, Hartong, and Nolan are sometimes collectively referred to herein as the "Audit Committee Defendants."

35.   As directors and/or officers of Activision, the Individual Defendants either knew, consciously disregarded, were reckless and grossly negligent in not knowing, or should have known the adverse, non-public information about the Company's business, operations, prospects, internal controls, and financials, including the Company's marketing and sales practices, product quality, financial and information reporting practices, internal controls, and security and risk practices, because of their access to internal corporate documents, conversations, and connections with one another, as well as other corporate officers and employees, attendance at Board meetings, and committee meetings thereof, as well as reports and other information provided to them in connection therewith.  The Individual Defendants either participated in, caused, failed to correct, and/or failed to take action to remedy the harm inflicted upon Activision through, *inter alia*, the issuance of the improper statements disseminated *via* press releases, SEC filings, and other means to the press, securities analysts, and Activision shareholders.

## IV.   SUBSTANTIVE ALLEGATIONS

### A.   Background Of Activision

36.   According to public filings and the Company's website, Activision is "one of the most valuable interactive entertainment companies in the world," through its development and distribution of digital entertainment products for video game consoles, personal computers, and mobile devices.  The Company was formed in July 2008 as the result of a merger between Activision, Inc. and Vivendi Games, the holding company for the video game studio Blizzard Entertainment.  Activision's portfolio includes a number of well-known franchises including World of Warcraft, Candy Crush, and Call of Duty.

37.   Bungie, Inc. ("Bungie") is a privately-held, American video game developer based in Bellevue, Washington, and a former subsidiary of Microsoft. Bungie was the original developer of the *Halo* military science fiction video game franchise, which it lauds as "an award-winning global entertainment phenomenon." Bungie is also the original developer of the blockbuster game franchises *Myth* and *Marathon.*

38.   On April 29, 2010, the Company announced its entry, through its wholly owned subsidiary Activision Publishing, into the Partnership Agreement with Bungie. The Partnership Agreement gave Activision exclusive rights to publish and distribute video games developed by Bungie for the following ten years.

39.   Significantly, the partnership between Activision and Bungie yielded the commercially successful *Destiny* franchise, a series of science fiction-themed video games set in a mythic world where gamers function as "guardians" tasked with saving the earth from aliens.

40.   Pursuant to a Licensing Agreement between the Company and Bungie, the parties undertook a "release plan" whereunder Bungie would develop: (i) four major retail installments in the *Destiny* franchise, tentatively scheduled for the fall of 2013, 2015, 2017, and 2019; and (ii) four major downloadable content expansion

pack-type software releases tentatively scheduled for the fall of 2014, 2016, 2018 and 2020 (the "Release Plan").

41.     Under the terms of the Licensing Agreement, Activision would handle publication and distribution of the products comprising the Release Plan.  In exchange, the parties contemplated that Activision would retain up to 80% of *Destiny*-related revenues.

42.     The Licensing Agreement further provided that, following the release of the products comprising the Release Plan, Activision would "have a right of first negotiation to publish and distribute . . . Future Destiny Games."

43.     Notably, the Licensing Agreement gave Activision—but not Bungie—the unilateral right to terminate the Licensing Agreement without penalty following the release of the second content expansion pack.  Doing so, however, would automatically trigger a reversion to Bungie of all licenses for future works in the *Destiny* franchise. The Licensing Agreement also permitted the parties to terminate the agreement in the event of an uncured, material breach.

44.     Activision was also conferred certain supervisory and oversight responsibilities over Bungie's development of the *Destiny* products.  Specifically, Activision was given the right to designate one person to attend and participate as a non-voting observer in all meetings of Bungie's Board of Directors.

45.     Bungie was also required to provide Activision with consumer play data such that Activision would have visibility on key strategic metrics, enabling it to run analytics to facilitate decisions on downloadable content, release timings, and future features.

46.     Notably, the Licensing Agreement included the following dispute resolution provision:

> Any decisions under this Agreement requiring the mutual agreement or approval of the parties hereto, including, but not limited to, any development, production, marketing, retail or other decisions, to the extent the parties' day-to-day business personnel are unable to reach a mutual agreement on any such decision, ***the parties agree that such***

***decision will be elevated to senior-level executives to try to resolve the disagreement***, except when Thomas Tipple or, if Thomas Tipple is no longer working for Activision, the then-current President and/or CEO of Activision, has the tie-breaking vote under this Agreement. ***Such senior-level dispute resolution procedure may also be triggered by either party hereto in the event a party reasonably believes that any activity or action being taken by the other party could adversely impact (a) the long-term viability of the Destiny Property franchise, (b) sales or revenues associated with the Products, and/or (c) the ability to attract and retain top talent and community viability***, and the parties' day-to-day business personnel are not otherwise able to reach an agreement on addressing such party's concerns.

47.     Activision and Bungie officially announced the *Destiny* franchise in a joint press conference on February 13, 2013.   In a press release dated February 18, 2013, the Company stated:

A new generation of gaming is upon us. Today, Activision Publishing, Inc., a wholly owned subsidiary of Activision Blizzard, Inc. (Nasdaq: ATVI), together with critically-acclaimed developer Bungie, revealed the first sneak peak of their partnership. The game, called Destiny, is an ambitious evolution of the first-person action genre that brings gamers together in a shared, persistent world. The result of a large-scale collaboration between Activision, the publisher of such mega franchises as *Call of Duty, Skylanders Spyro's Adventure*TM and *Skylanders Giants*TM, and Bungie, the creators of *Halo*®, Destiny is poised to become the next advancement in interactive entertainment by melding first-person action gaming with a persistent, dynamic online world.

48.     The Licensing Agreement further required that all notices and statements required to be delivered to Activision under the Licensing Agreement to be delivered to Activision's Vice President of Finance and General Counsel.

49.     In September 2014, Activision released *Destiny*, the first installment in the franchise, developed by Bungie.  Activision announced that the Company sold $500 million of *Destiny* into retail stores and first parties worldwide on the first day of its release, making the game the largest video game franchise launch in history at that time.   Activision later announced that the franchise sold over $325 million worldwide in the first five days and generated over $1.6 billion in revenue between 2014 and 2018.

50.     Over the next few years, the Company released several expansions to the franchise and a full sequel, *Destiny* 2, which launched in September 2017.  *Destiny* 2

1  broke pre-order records and record day-one performance on PlayStation Store,
2  establishing "engagement at the highest ever week-one concurrency for the franchise."

3      51.   Notwithstanding *Destiny's* chartbuster success, the relationship between
4  Bungie and Activision began to wane within a few years.  Analysts and users noted a
5  shift in the quality of Bungie's gaming content, which had historically prioritized the
6  individual player's experience, when the Company effected sales of
7  "microtransactions" and "level boosters" (*i.e.* letting a player purchase gaming add-
8  ons, effecting a "pay to win" paradigm).  Fans attributed Bungie's "drastic directional
9  shifts" to, *inter alia*, Activision's revenue demands and a high-pressure schedule.

10     52.   User malaise was further exacerbated by the Company's significant delay
11  in releasing *Destiny 2*, which was scheduled for release in the fall of 2015 under the
12  terms of the Licensing Agreement.  *Destiny 2* was ultimately [and belatedly] released
13  on September 6, 2017, *i.e.* two years later than anticipated.

14     53.   Bungie released Destiny 2 on September 6, 2017.  The game was broadly
15  acclaimed, and, on September 15, 2017, Activision announced that Destiny 2 had
16  "surpassed the original's records for engagement and digital sales in launch week."

17     54.   In June 2018, Bungie announced that it had partnered with a Chinese
18  publisher, NetEase, "who [could] bring its games into the Chinese market."  Although
19  Bungie denied that the deal would impact its relationship or agreement with Activision,
20  Bungie's CEO, Parsons, said the move was "really about who are the teams we want
21  to build with and what are the games we want to make [and] what are the business
22  model[.]."

23     55.   Shortly after Bungie's announcement of the NetEase deal, Bungie and
24  Activision initiated settlement negotiations which would allow Bungie to extricate
25  itself from the Licensing Agreement (and its relationship with Activision).

26     56.   The negotiations precipitated further tension between Activision and
27  Bungie.  On November 8, 2018, on a 3Q18 conference call, Johnson attributed
28

AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Activision's poor results on the *Destiny* franchise and its "underperformance against our expectations to date."

57.    In response, Bungie published a Tweet which stated: "We are not disappointed with Forsaken [the most recent *Destiny* expansion].  We set out to build a game that *Destiny* players would love, and at Bungie, we love it too.  Building Destiny for players who love it is and will remain our focus going forward."

58.    By late 2018, Activision was also confronting an amalgam of operational pressures, including the departure of Activision Blizzard CEO and President Mike Morhaime, the resignation of Blizzard CFO Amrita Ahuja, the termination of defendant Neumann, poor sales of Activision's *Call of Duty: Black Ops 4* game, the failure to release an installment in Activision's *Diablo* franchise, and mounting public perception that Activision was losing a substantial percentage of its player base to competitor Fortnite.  During this time, it was reported that Activision's overall player base had declined by 7 million players.

59.    Yet, notwithstanding the growing enmity between Bungie and Activision and the ***active negotiations*** to terminate their contractual relationship, Activision would not disclose to the investing public that Activision and Bungie were ending their relationship until January 10, 2019.

**B.    The Individual Defendants<br>Caused Activision To Make Improper<br>Statements During The Relevant Period**

60.    Throughout the Relevant Period, the Individual Defendants caused the Company to make false and misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and growth prospects, which were known at the time to the Individual Defendants and/or recklessly disregarded by them.

61.    On August 2, 2018, the Individual Defendants caused the Company to issue a press release, filed on Form 8-K with the SEC, announcing the Company's financial and operating results for the second quarter of 2018 (the "Q2 2018 8-K").

In the Q2 2018 8-K, Activision touted successful user engagement metrics for the *Destiny* franchise, stating, in relevant part:

> During the quarter, *Destiny* 2 released its second expansion, *Warmind*, with higher attach rates than *Destiny 1's* second expansion, and *Destiny 2* [Monthly Active Users] grew quarter-over-quarter.

62. Also, on August 2, 2018, the Individual Defendants caused Activision to file a quarterly report on Form 10-Q with the SEC for the quarter ended June 30, 2018 (the "Q2 2018 10-Q"). The Q2 2018 10-Q listed *Destiny* among the Company's "key product franchises", and informed investors that "[w]e have . . . established a ***long-term alliance*** with Bungie to publish its game universe, Destiny."

63. The Q2 2018 10-Q contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Kotick and Neumann, stating that "[t]he information contained in the [Q2 2018 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company."

64. In addition, Activision held its Q2 2018 Earnings Call on the same date, August 2, 2018. On that call, Defendant Johnson stated in relevant part:

> Turning to *Destiny*, Bungie and Activision continue to make updates and engaging content for *Destiny's* fans. *Destiny 2's* second expansion, *Warmind*, was released in Q2 with a higher attach rate than *Destiny 1's* second expansion, and *Destiny 2* monthly active users grew quarter-over-quarter.
>
> Now the next big step in the franchise is *Forsaken*, the major expansion coming out in September. We think this release will drive strong community engagement, particularly around the innovation in Gambit, a new competitive co-op mode which we think could be transformative for the way people play in first-person action games.

65. After Defendant Johnson finished his prepared remarks, an analyst pressed him for "an update on the *Destiny* franchise and just your expectations for the major expansion this fall". In response, Defendant Johnson stated:

> As you'll remember, we've talked a lot about listening to the *Destiny* community to provide a deeper ongoing experience, more engaging moment to moment gameplay and a series of updates with better rewards in the ongoing live game. ***And the team at Bungie and the team here at Activision have made a lot of strides in doing that, particularly the last two quarters, with the ongoing improvements in the end game and the overall gameplay experience.***

But in particular, with the *Warmind* expansion in May, that really showed us the ability to evolve the game and regrow engagement and regrow users.  And now, that community, that's the most positive place since *Destiny* 2 launched last September.  And so, now we have this big step with the launch of *Forsaken* which happens next month.

The encouraging part is players have had a great response so far with engagement online around the content announcements, hands-on gameplay at E3, which honestly led to the highest social sentiment we've seen in three years at E3; and a lot of excitement around Gambit, which brings this whole new way to play that's both cooperative and competitive between teams.   And we really do think it can be transformative.

So, we feel good about the content to come and the engagement we've seen in the community overall, and we feel really good about what *Forsaken* would do to build on that momentum. So we're excited for it, and we're in that countdown period now to put it in the hands of our fans.

66.    On September 4, 2018, the Individual Defendants caused the Company to issue a press release announcing the worldwide release of its *Destiny* 2 expansion, *Forsaken*.  The press release teased investors and gamers alike, stating that there were "***plenty of surprises in store in the weeks and months ahead***, and we have been working all year with our community to make sure Forsaken will meet their expectations."

67.    On November 8, 2018, the Individual Defendants caused Activision to issue a press release, filed on Form 8-K with the SEC, announcing its financial and operating results for the quarter ended September 30, 2018 (the "Q3 2018 8-K").  In the Q3 2018 8-K, Activision again touted successful user engagement metrics for the *Destiny* franchise, stating, in relevant part, that "*Destiny* MAUs grew quarter-over-quarter and year-over-year, driven by the launch of Forsaken and reach initiatives for the base game."

68.    On November 8, 2018, Activision also filed a quarterly report with the SEC on Form 10-Q for the quarter ended September 30, 2018 (the "Q3 2018 10-Q").  Again, the Q3 2018 10-Q listed *Destiny* among the Company's "key product franchises", and informed investors that "[w]e have . . . established ***a long-term alliance with Bungie*** to publish its game universe, Destiny."

69.     The Q3 2018 10-Q contained signed certifications pursuant to SOX by Defendants Kotick and Neumann, stating that "[t]he information contained in the [Q3 2018 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company."

70.     On November 8, 2018, Activision also held its Q3 2018 Earnings Call. During the call, Defendant Johnson touted the Company's growth in MAUs: "driven by *Destiny*'s expansion, Forsaken, and by new reach initiatives, which grew *Destiny* monthly active users quarter on quarter and year over year."  After acknowledging that the release of the *Destiny* 2 expansion pack *Forsaken* "did not achieve [the Company's] commercial expectations", Defendant Johnson stated that "there's still work [for the Company] to do to fully reengage the core *Destiny* fan base."

71.     When pressed specifically on the "health of the *Destiny* franchise," **Defendant Johnson failed to discuss any potential rift between the Company and Bungie which could lead to a split of their partnership**, as shown by Defendant Johnson's response to the analyst question below:

[Drew Crum - Stifel, Nicolaus & Co., Inc.]

You touched on this a little bit, but maybe spend a little more time on the health of the **Destiny** franchise and just what you've seen in terms of engagement post the Forsaken launch.  Thanks.

[Collister Johnson - Activision Blizzard, Inc.]

I guess I'd start by reiterating that *Forsaken* is a high-quality expansion of content into the universe.  Honestly, it's the highest-quality content we've seen in the franchise to date.  It really came out of Activision and Bungie working together to address community concerns post-*Destiny* 2 holistically.  Talking to players, we knew it came from users really doing a fundamental review of how to offer a deeper end-game, greater powers and greater rewards, and engage players who seemed to be really enjoying the content.  In particular, it was very well received both by reviewers and by the community,and has ongoing deepening engagement by those that are playing it.

At BlizzCon, we announced that *Destiny*, the base game is free for two weeks, meaning download it by November 18, and you get to keep the base game forever.  We did that because we want the whole community loaded up and able to play it, but also because it's a live game.  And once you're in it, with the ongoing features and services and content, there's really deep engagement that takes place.  And part of it was also because

we have not yet seen the full core reengage in *Destiny*, which has led to the underperformance against our expectations to date. Some players we think are still in wait-and-see mode. So when you're in, you're deeply engaged. If you're not, we're hoping now is the time to work and to bring players back in and to win them back.

72. These statements were false and misleading when made, because the Individual Defendants were aware that:

      (i)    Activision and Bungie would be terminating the Partnership Agreement, which would result in Bungie having full control over the Destiny franchise;

      (ii)   the termination of the Partnership Agreement would foreseeably have a significant negative impact on Activision's revenues;

      (iii)  as a result, Activision's growth and revenues would be adversely affected; and

      (iv)  Activision failed to maintain adequate internal controls.

73. Accordingly, Defendants' public statements were materially false and misleading. As a result of the Defendants' materially false and misleading statements and omissions, Activision shares traded at artificially inflated prices during the Relevant Period. Once the true facts regarding the Company's financial prospects and future business prospects began to emerge, the Company's stock price fell dramatically.

## V. **THE TRUTH EMERGES**

74. On January 4, 2019, the Individual Defendants caused the Company to file a report on Form 8-K with the SEC, announcing that Defendant Neumann was terminated from his role as CFO as of December 31, 2018, "for cause after he violated his legal obligations to the Company." According to the report, "[t]hese violations were unrelated to the Company's financial reporting or disclosure controls and procedures." Dennis Durkin was appointed to the role of the Company's CFO on January 2, 2019.

75. On January 10, 2019, Activision and Bungie abruptly announced the end of their business relationship. In a post on its website entitled "Our Destiny", Bungie stated, in relevant part:

> We have enjoyed a successful eight-year run and would like to thank Activision for their partnership on Destiny.  Looking ahead, we're excited to announce plans for Activision to transfer publishing rights for Destiny to Bungie.  With our remarkable Destiny community, we are ready to publish on our own, while Activision will increase their focus on owned IP projects.
>
> ***The planned transition process is already underway in its early stages***, with Bungie and Activision both committed to making sure the handoff is as seamless as possible.

76.     That same day, the Individual Defendants caused the Company to file a report on Form 8-K with the SEC, stating as follows:

> On January 10, 2019, Activision Publishing, Inc., a wholly-owned subsidiary of Activision Blizzard, Inc. (the "Company"), and Bungie, Inc. ("Bungie") announced plans for Bungie to assume full publishing rights and responsibilities for the Destiny franchise.  Going forward, Bungie will own and develop the franchise.
>
> As a result, the Company does not expect to recognize material revenue, operating income or operating loss from the Destiny franchise in 2019.

77.     Following these announcements, the Company's stock price fell $4.81 per share, or 9.37%, to close at $46.54 on January 11, 2019.

78.     A January 14, 2019 article on Polygon.com stated that players—in stark contrast to the market—"reacted joyfully" to the news, since "Activision's corporate overlords are perceived by players to have meddled detrimentally in Bungie's games," by pushing for changes that fans disliked.  As a result of Activision's meddling, some users stopped playing *Destiny* 2 and did not return, and "Activision blamed *Destiny* 2's underperformance for its own poor financial results."

79.     In the weeks that followed, Activision's stock continued to fall, dropping to close at only $40.11 per share on February 11, 2019.

80.     On February 12, 2019, the Individual Defendants caused Activision to issue a press release and file a current report on Form 8-K with the SEC, reporting its financial results for the fiscal quarter and year ended December 31, 2018.  The Form 8-K also stated that on January 31, 2019, the Board authorized the Company to repurchase up to $1.5 billion of the Company's common stock.

81.     During the Company's investor earnings call the same day, Defendant Kotick announced that Activision's guidance for 2019 was only $6.03 billion in net revenue, a decline of 20% from 2018.  According to CFO Durkin, Activision would "not generate material revenue from Destiny in 2019, following the sale of publishing rights to Bungie.  Excluding Destiny in both years, our outlook is roughly flat for net bookings for the rest of the Activision segment in 2019."  Despite this negative news, executive compensation packages remained the same.

82.     Moreover, in a shock to Activision employees, the Company announced a significant restructuring, including layoffs of approximately 800 employees, or about 8% of Activision's workforce.

## VI.    DUTIES OF THE INDIVIDUAL DEFENDANTS

83.     Plaintiff brings this action derivatively, in the right and for the benefit of Activision, to redress the breaches of fiduciary duty and other violations of law by Defendants.

### A.    Fiduciary Duties

84.     By reason of their positions as officers, directors, and/or fiduciaries of Activision, and because of their ability to control the business and corporate affairs of Activision, the Individual Defendants owed and owe the Company and its shareholders fiduciary obligations of loyalty, good faith, due care, and candor, and were, and are, required to use their utmost ability to control and manage Activision in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Activision and its shareholders so as to benefit all shareholders equally, and not in furtherance of their personal interest or benefit.

85.     Each director and officer of the Company owes to Activision and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

86.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Activision, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. Because of their advisory, executive, managerial, and directorial positions with Activision, each of the Individual Defendants had knowledge of material, non-public information regarding the Company.  In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's financial and business prospects so that the market price of the Company's stock would be based on truthful and accurate information.

87.     To discharge their duties, the officers and directors of Activision were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company.  By virtue of such duties, the officers and directors of Activision were required to, among other things:

a.     exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

b.     exercise good faith to ensure that the Company was operated in a diligent, honest, and prudent manner, and complied with all applicable federal and state laws, rules, regulations, and requirements, and all contractual obligations, including acting only within the scope of its legal authority; and

c.     when put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

**B.     <u>Audit Committee Duties</u>**

88.     In addition to these duties, the members of the Audit Committee owed specific duties to Activision under the Audit Committee's Charter, including duties to review and approve quarterly and annual financial statements and earnings press

AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  releases, and to ensure that the Company had appropriate and effective internal
2  controls over financial reporting.

3       89.    Specifically, according to the Company's Audit Committee Charter, the
4  Audit Committee has primary responsibilities to oversee the accounting and financial
5  reporting processes of the Company and its subsidiaries and the audits of the financial
6  statements of the Company.  The Audit Committee's duties related to overseeing the
7  financial reporting process and internal controls include the obligations to:

8       1.    Review and evaluate:

9           (a)    the adequacy and effectiveness of the Company's
10                 accounting and internal control policies and procedures on
11                 a regular basis, including the responsibilities, budget, and
                   staffing of the Company's internal audit function through
                   inquiry and periodic meetings with the Company's
12                 independent auditors and internal audit department;

13          (b)    the yearly report prepared by management, and attested to
14                 by the Company's independent auditors, assessing the
                   effectiveness of the Company's internal control over
15                 financial reporting and stating management's responsibility
                   for establishing and maintaining adequate internal control
16                 over financial reporting prior to its inclusion in the
                   Company's Annual Report on Form 10-K; and

17          (c)    the Committee's level of involvement and interaction with
18                 the Company's internal audit function, including the
                   Committee's line of authority and role in appointing
                   employees in the internal audit function.

19      2.    Review with the Chief Executive Officer, principal financial
20            officer, principal accounting officer and independent auditors,
              periodically, the following:

21          (a)    any significant deficiencies and material weaknesses in the
22                 design or operation of internal control over financial
                   reporting which are reasonably likely to adversely affect the
23                 Company's ability to record, process, summarize and report
                   financial information; and

24          (b)    any fraud, whether or not material, that involves
25                 management or other employees who have a significant role
                   in the Company's internal control over financial reporting.

26      3.    Discuss with management guidelines and policies governing the
27            process by which senior management of the Company and the
              relevant departments of the Company, including the internal audit
28            department, assess and manage the Company's exposure to risk,
              as well as the Company's major financial risk exposures and the

steps management has taken to monitor and manage such exposures.

4. Review with management the progress and results of all internal audit projects, and, when deemed necessary or appropriate by the Committee, assign additional internal audit projects to the chief internal audit executive.

5. Receive periodic reports from the Company's independent auditors, management and chief internal audit executive to assess the impact of significant accounting or financial reporting developments on the Company.

6. Review and discuss with the independent auditors the results of the year-end audit of the Company, including any comments or recommendations of the Company's independent auditors. Based on such review and discussions and on such other considerations as it determines appropriate, recommend to the Board whether the Company's financial statements should be included in the Annual Report on Form 10-K.

7. Establish and maintain free and open means of communication between and among the Committee, the Company's independent auditors, the Company's internal audit department and management, including providing such parties with appropriate opportunities to meet separately and privately with the Committee on a periodic basis.

8. Discuss the Company's earnings, press releases (including the use of "pro forma" or "adjusted" information), as well as financial information and earnings guidance provided by the Company to analysts and rating agencies. This discussion may be general in nature (i.e., to discuss the types of information to be disclosed and the type of presentations to be made). The Committee need not discuss in advance each earnings release or each instance in which the Company may provide earnings guidance.

90. Upon information and belief, the Company maintained an Audit Committee Charter during the Relevant Period that imposed the same, or substantially and materially the same or similar, duties on the members of the Audit Committee as those set forth above.

## C. Duties Pursuant To The Company's Code Of Conduct And Corporate Governance Principles

91. Additionally, the Individual Defendants, as officers and/or directors of Activision, are bound by the Company's Code of Conduct (the "Code"), which sets forth specific policies to guide directors and employees in the performance of their

21

duties.  According to the Company's website, the Code is "here to help us live by our values and do business the right way for all our stakeholders – gamers, fans, customers, business partners, fellow employees, shareholders and everyone else who is a part of what we do."

92.    According to the section of the Company's website describing the Code:

> Our company, and we as employees, must comply with all of the laws, rules and regulations that apply to our business wherever we do business – in every city, state and country.  And no, you don't need to know the details of every law related to your area of responsibility by heart.  But yes, you do need to know enough to do your job with integrity and to recognize when it's time to get in touch with one of our friends in the Legal Department.  If you're ever unsure whether or not to act or what action to take – or whether or not that action is legal and respectful in any location – it's always better to just ask!

93.    Further, in addition to the Code, the Company's Board is subject to Activision's Corporate Governance Principles and Polices, which includes the following:

> The Board insists on an ethical business environment that focuses on adherence to both the letter and the spirit of regulatory and legal mandates. The Board expects that management will conduct operations in a manner supportive of this view. The Board is committed to avoiding any transactions that compromise, or appear to compromise, director independence.  The Board also oversees a corporate compliance program, which includes a Company code of conduct, the maintenance of accounting, financial and other controls, and the review of the adequacy of such controls.

94.    Upon information and belief, the Company maintained a version of the Code and Corporate Governance Principles and Polices during the Relevant Period that imposed the same, or substantially and materially the same or similar, duties on the Individual Defendants, as those set forth above.

**D.    Control, Access, And Authority**

95.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Activision, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Activision.

96.    Because of their advisory, executive, managerial, and directorial positions with Activision, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and improper representations of Activision.

97.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Activision and was at all times acting within the course and scope of such agency.

**E.    Reasonable And Prudent Supervision**

98.    To discharge their duties, the officers and directors of Activision were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of Activision were required to, among other things:

   a.    ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

   b.    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

   c.    properly and accurately guide investors and analysts as to the true financial and business prospects of the Company at any given time, including making accurate statements about the Company's business and financial prospects and internal controls;

   d.    remain informed as to how Activision conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, and take steps to correct such conditions or practices, and make such disclosures as necessary to comply with securities laws;

1          e.      refrain from trading on material, adverse, non-public information;

2     and

3          f.      ensure that Activision was operated in a diligent, honest, and

4     prudent manner in compliance with all applicable laws, rules, and regulations.

5  **VII.  BREACHES OF DUTIES**

6          99.     Each Individual Defendant, by virtue of his position as a director and/or

7  officer, owed to Activision and its shareholders the fiduciary duty of loyalty and good

8  faith, and the exercise of due care and diligence in the management and administration

9  of the affairs of Activision, as well as in the use and preservation of its property and

10  assets.  The conduct of the Individual Defendants complained of herein involves a

11  knowing and culpable violation of their obligations as directors and officers of

12  Activision, the absence of good faith on their part, and a reckless disregard for their

13  duties to Activision and its shareholders that the Individual Defendants were aware, or

14  should have been aware, posed a risk of serious injury to Activision.

15          100.    The Individual Defendants each breached their duties of loyalty and good

16  faith by issuing, or causing the Company to issue, false and/or misleading statements

17  that misled shareholders into believing that disclosures related to the Company's

18  financial and business prospects were truthful and accurate when made.

19  **VIII.  CONSPIRACY, AIDING AND**
20  **ABETTING, AND CONCERTED ACTION**

21          101.    In committing the wrongful acts alleged herein, the Individual Defendants

22  have pursued, or joined in the pursuit of, a common course of conduct and have acted

23  in concert with, and conspired with, one another in furtherance of their wrongdoing.

24  The Individual Defendants further aided and abetted and/or assisted each other in

25  breaching their respective duties.

26          102.    During all times relevant hereto, the Individual Defendants collectively

27  and individually initiated a course of conduct that was designed to mislead shareholders

28  into believing that the Company's business and financial prospects were better than

they actually were.  In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

103.   The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (a) disguise the Individual Defendants' violations of law, including breaches of fiduciary duties and unjust enrichment; and (b) disguise and misrepresent the Company's actual business and financial prospects.

104.   The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully, recklessly, or negligently release improper statements.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

105.   Each of the Individual Defendants aided and abetted, and rendered substantial assistance in, the wrongs complained of herein.  In taking such actions to substantially assist the commissions of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## IX.   **DAMAGES TO THE COMPANY**

106.   As a result of the Individual Defendants' wrongful conduct, Activision disseminated false and misleading statements and omitted material information to make such statements not false and misleading when made.  The improper statements have devastated Activision's credibility.  Activision has been, and will continue to be, severely damaged and injured by the Individual Defendants' misconduct.

107.   Further, as a direct and proximate result of the Individual Defendants' conduct, Activision has expended, and will continue to expend, significant sums of money.  Such expenditures include, but are not limited to:

      a.    costs incurred in investigating and defending Activision and certain officers in pending securities litigation;

      b.    costs incurred from compensation and benefits paid to the Individual Defendants, which compensation was based, at least in part, on the Company's artificially inflated stock price; and

      c.    costs incurred from the loss of the Company's customers' confidence in Activision and its products.

108.   Moreover, these actions have irreparably damaged the Company's corporate image and goodwill.  For at least the foreseeable future, Activision will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that the Company's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## X.     DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

109.   Plaintiff brings this action derivatively, in the right and for the benefit of Activision, to redress the breaches of fiduciary duty and other violations of law by Defendants.

110.   Plaintiff will adequately and fairly represent the interests of Activision and its shareholders in enforcing and prosecuting its rights and has retained counsel experienced in litigating this type of action.

111.   Plaintiff was a shareholder of Activision common stock at the time of the wrongdoing of which Plaintiff complains and has been continuously since.

112.   At the time this derivative action was initiated, the Board consisted of the following ten directors: Defendants Bowers, Corti, Hartong, Kelly, Kotick, Meyer, Morgado, Nolan, Wasserman, and Wynn.  Demand futility only needs to be alleged as to a majority (*i.e.,* five) of these Director Defendants who were on Activision's Board when this complaint was first filed.

113.   A majority of these individuals are not disinterested and independent with respect to the acts and omissions alleged herein.  Plaintiff did not make any demand on the Director Defendants to institute this action because such a demand would be a futile, wasteful, and useless act as explained further herein.

A.   **Demand Is Futile As To All Director Defendants Because The Director Defendants Face A Substantial Likelihood Of Liability**

114.   The Director Defendants face a substantial likelihood of liability for their breaches of fiduciary duties of loyalty and good faith.  The Director Defendants were directors throughout the Relevant Period, and, as such, had fiduciary duties to ensure the Company's SEC filings, press releases, and other public statements and presentations made on behalf of the Company concerning its financial and business prospects were accurate.

115.   The Director Defendants, by virtue of 1) Activision's supervisory and oversight responsibilities over Bungie's development of the *Destiny* products and 2) their receipt of consumer play data from Bungie, which enabled them to make decisions on downloadable content, release timings, and future features, inferentially knew, or recklessly failed to discover, that they were causing the Company to make false public statements with regard to the future of Activision's relationship with Bungie.

116.   As further alleged herein, the split between Activision and Bungie had been ongoing and Activision had taken major, systematic steps to begin unwinding the relationship prior to making the alleged misrepresentations.  Bungie's acquisition of $100 million from the Chinese internet company NetEase in June 2018 was part of the process of unwinding the parties Licensing Agreement.   Similarly, Activision's removal of hundreds of its own developers from the Destiny project in late Spring 2018 was also part of the unwinding process.   Due to the size and importance of the Activision-Bungie relationship to Activision, the Director Defendants would have been aware of the winding down process, which was a significant change in the relationship.

117.   Moreover, the Director Defendants had a motive to conceal the Bungie split: to stem a wave of contemporaneous bad news.   Specifically, throughout the Relevant Period, Activision was forced to deal with: (i) the departure of its CEO and President Mike Morhaime; (ii) disappointing sales of *Call of Duty: Black Ops 4*; (iii) the public failure to release the next installment of the *Diablo* franchise; (iv) losing market share to competitor *Fortnite*; and (v) a decline by seven million in Activision's overall player base.

118.   Indeed, the Director Defendants were responsible for reviewing and approving the Company's financial statements.  By authorizing the false financial and public statements filed with the SEC during the Relevant Period as alleged herein, the Director Defendants were active participants in breaches of duties of loyalty, good faith, and candor, and have subjected the Company to lawsuits claiming violations of the federal securities laws.  A director's breach of the duty of candor, good faith, or loyalty is not entitled to protection under the business judgment rule.  As a result, any demand upon the Director Defendants to bring suit against themselves would be a useless and futile act.

119.   Demand is excused as to all the Director Defendants because each one individually faces a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to engage in deliberately issuing false and misleading statements to mislead investors, in violation of federal securities laws.  As is described above, the Director Defendants either knew, or were reckless in not knowing, that Activision's contract with Bungie was about to be terminated while certain Defendants made statements and omissions to the contrary, exposing the Company to pecuniary loss and legal risks.  The business judgment rule protects a wide variety of business decisions but does not protect a corporation's officers and directors from causing a company to engage in conduct that violates federal securities laws.

120.   As a result of the alleged misconduct described above, the Director Defendants face a substantial likelihood of liability for their breaches of fiduciary duties, rendering any demand upon them futile.  This conduct is not entitled to the protections of the business judgment rule, which also independently excuses demand.

121.   Moreover, the Director Defendants were specifically responsible for ensuring Activision had adequate internal controls regarding the Company's compliance with federal and state rules and regulations regarding its business and disclosure practices.  Thus, the Director Defendants are directly responsible for Activision's failure to adopt and implement such internal controls, and for the substantial damages Activision is subject to in ongoing lawsuits.  As such, all the Director Defendants face a substantial likelihood of liability for the claims asserted herein.  Demand is therefore futile.

122.   Indeed, the Director Defendants, knowingly and/or with reckless disregard reviewed, authorized, and/or caused the publication of materially false and misleading statements throughout the Relevant Period, causing the Company's stock to trade at artificially-inflated prices.

123.   Further, the Director Defendants wasted corporate assets by paying improper compensation, bonuses, and severance to certain of the Company's executive officers and directors.  The handsome remunerations paid to wayward fiduciaries who proceeded to breach their fiduciary duties to the Company was improper and unnecessary, and no person of ordinary, sound business judgment would view this exchange of consideration for services rendered as fair or reasonable.

124. The Director Defendants' making or authorization of false and misleading statements throughout the Relevant Period, failure to timely correct such statements, failure to take necessary and appropriate steps to ensure that the Company's internal controls or internal auditing and accounting controls were sufficiently robust and effective (and/or were being implemented effectively), failure to take necessary and appropriate steps to ensure that the Audit Committee's duties

1    were being discharged in good faith and with the required diligence, and/or acts of

2    corporate waste, and abuse of control constitute breaches of fiduciary duties, for which

3    the Director Defendants face a substantial likelihood of liability.

4        125.   If the Director Defendants were to bring a suit on behalf of Activision to

5    recover damages sustained as a result of this misconduct, they would expose

6    themselves to significant liability.  This is something they will not do.  For this reason,

7    demand is futile.

8                    **B.**      **Demand Is Futile As To**

9                              <u>**Audit Committee Defendants**</u>

10       126.   During the Relevant Period, Defendants Corti, Hartong, and Nolan each

11   served as members of the Audit Committee.   Pursuant to the Company's Audit

12   Committee Charter, the Audit Committee Defendants were specifically responsible

13   for, among other things, reviewing and approving quarterly and annual financial

14   statements and earnings press releases, overseeing the Company's internal controls

15   over financial reporting, and discharging their other duties described herein.

16       127.   Despite their duties, the Audit Committee Defendants knowingly or

17   recklessly reviewed and approved, or failed to exercise due diligence and reasonable

18   care in reviewing and preventing the dissemination of, false and/or materially

19   misleading earnings press releases and quarterly and annual financial statements, and

20   failed in their specific duties to ensure that the Company's internal controls over

21   financial reporting were sufficient, and that statements made by the Company

22   regarding its business and financial prospects were accurate.

23       128.   Demand is futile as to Defendant Corti for additional reasons.  During

24   the Relevant Period, Corti has been the Chair of the Audit Committee.  Moreover,

25   Corti received total compensation from Activision of $379,713 in 2018, and almost

26   the same amount in 2017.  Despite his role on the Board and the compensation he

27   received, Defendant Corti performed little, if any, oversight of Activision's improper

28   false and misleading statements, consciously disregarded his duties to monitor such

1  controls over financial reporting, and consciously disregarded his duties to protect
2  Activision's assets.  Accordingly, Defendant Corti faces a substantial likelihood of
3  liability for breaches of fiduciary duties and is not independent or disinterested,
4  rendering making a demand upon him excused as a futile act.

5      129.   Demand is futile as to Defendant Hartong for additional reasons.  During
6  the Relevant Period, Hartong has been a member of the Audit Committee.  Moreover,
7  he received total compensation from Activision of $350,713 in 2018, and almost the
8  identical amount in 2017.  Despite his role on the Board and the compensation he
9  received, Defendant Hartong performed little, if any, oversight of Activision's
10 improper false and misleading statements, consciously disregarded his duties to
11 monitor such controls over financial reporting, and consciously disregarded his duties
12 to protect Activision's assets.  Accordingly, Defendant Hartong faces a substantial
13 likelihood of liability for breaches of fiduciary duties, is not independent or
14 disinterested, rendering making a demand upon him excused as a futile act.

15     130.   Demand is futile as to Defendant Nolan for additional reasons.  During
16 the Relevant Period, Nolan has been a member of the Audit Committee.  Moreover,
17 he received total compensation from Activision of $347,963 in 2018, and nearly that
18 much in 2017.  Despite his role on the Board and the compensation he received,
19 Defendant Nolan performed little, if any, oversight of Activision's improper false and
20 misleading statements, consciously disregarded his duties to monitor such controls
21 over financial reporting, and consciously disregarded his duties to protect Activision's
22 assets.  Accordingly, Defendant Nolan faces a substantial likelihood of liability for
23 breaches of fiduciary duties and is not independent or disinterested, rendering making
24 a demand upon him excused as a futile act.

25     131.   For the foregoing reasons, the Audit Committee Defendants face a
26 sufficiently substantial likelihood of liability for breach of their fiduciary duties of
27 loyalty and good faith.  Any demand upon the Audit Committee Defendants therefore
28 is futile.

AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

C.     **Demand Is Futile As To**
       **Kotick For Additional Reasons**

132.   In addition to the foregoing reasons discussed as to why demand is futile as to all Director Defendants, demand is futile as to Defendant Kotick because he was not independent.   Notably, Activision and the Individual Defendants themselves concede that Kotick is not an independent director in the Company's statements filed with the SEC.   Kotick has been the Company's CEO since 1991 and also was the Company's President from July 2008 to June 2017.

133.   The Company provides Kotick with his principal occupation, for which Kotick receives substantial compensation.   Activision paid Kotick total compensation of $30,841,004 in 2018.   This compensation provides a substantial personal benefit to Kotick, and demand on him is futile because any action taken against him by the Board would threaten the economic benefits that he receives from Activision.

134.   Further, Defendant Kotick indirectly owns aircraft that are operated by a charter operator that Kotick indirectly owns and manages.   Kotick, as well as other officers and directors of the Company, use these aircraft for travel in connection with Activision's business.   During 2018, with the authorization of the Audit Committee, the Company paid $3,125,751 for the use of these aircraft.   These payments, to the benefit of Kotick's personal interests, demonstrates a conflict of interest the prevents Kotick from disinterestedly considering a demand.

135.   Defendant Kotick was responsible for all of the false and misleading statements and omissions that were made during the Relevant Period, including the SEC filings which he executed SOX certifications. Defendant Kotick performed little, if any, oversight of Activision's improper false and misleading statements, consciously disregarded his duties to monitor such controls over financial reporting, and consciously disregarded his duties to protect Activision's assets.   Accordingly, Defendant Kotick faces a substantial likelihood of liability for breaches of fiduciary

1   duties, is not independent or disinterested, rendering making a demand upon him

2   excused as a futile act.

3       136.   Finally, Defendant Kotick cannot disinterestedly consider a demand to

4   bring suit against himself because he is a named defendant in the Securities Class

5   Action, which alleges that he made many of the same misstatements described above

6   in violation of the federal securities laws.  Thus, if Kotick was to initiate suit on behalf

7   of Activision, he would compromise his ability to simultaneously defend himself in

8   the Securities Class Action and would expose himself to liability in this action.  Kotick

9   will not do this, and demand is therefore futile.

10          **D.   Demand Is Futile As To**

11               **Kelly For Additional Reasons**

12      137.   In addition to the reasons discussed herein as to why demand is futile as

13   to all Director Defendants, demand is futile as to Defendant Kelly because he was not

14   independent.  Notably, Activision and the Individual Defendants themselves concede

15   that Kelly is not an independent director in the Company's statements filed with the

16   SEC.   Kelly has been the Company's Chairman of the Board since 2013 and has been

17   a director of the Company since July 1995.  Kelly was also the co-chairman of the

18   Board from October 1998 until October 2013.

19      138.   Further, Kelly's long history with the Company includes his role as

20   partner of an investment vehicle that purchased $2.34 billion of the Company's shares

21   during a buyback in 2013.  Following that transaction, the investor group owned

22   approximately 25% of the Company's shares.

23      139.   Kelly also co-founded, with Kotick, the Call of Duty Endowment, an

24   organization that assists military veterans with job placement.  The Call of Duty

25   Endowment relies on financial support from the Company.  Kelly is not disinterested

26   or independent, and demand on him is futile and is excused.

27      140.   Defendant Kelly performed little, if any, oversight of Activision's

28   improper false and misleading statements, consciously disregarded his duties to

monitor such controls over financial reporting, and consciously disregarded his duties to protect Activision's assets.  Accordingly, Defendant Kelly faces a substantial likelihood of liability for breaches of fiduciary duties and is not independent or disinterested, rendering making a demand upon him excused as a futile act.

### E.    Demand Is Futile As To All Director
### Defendants For Additional Reasons

141.  The Board of Activision has already demonstrated that it cannot independently and disinterestedly consider a pre-suit demand to bring the claims set forth herein.  Despite the wrongdoing of the Company's executive officers, including Defendants Kotick and Johnson, who, respectively, still serve as the Company's CEO and President and Chief Operating Officer, the Board has taken no action to address the harm this misconduct has caused the Company.

142.  Each of the Director Defendants receives a lavish annual retainer of approximately $350,000 or more, as well as awards of Activision stock, purely for being a Board member.  This compensation provides a substantial stipend to these directors, from which each of them personally benefits and depends on for his or her livelihood.  Demand on each of the directors is futile because, through their course of conduct to date, they have demonstrated their unwillingness to undertake any action that would threaten the economic benefits they receive as members of Activision's Board.

143.  The Director Defendants performed little, if any, oversight of Activision's improper false and misleading statements, consciously disregarded their duties to monitor such controls over financial reporting, and consciously disregarded their duties to protect Activision's assets.  Accordingly, the Director Defendants each face a substantial likelihood of liability for breaches of fiduciary duties, are not independent or disinterested, rendering making a demand upon them excused as a futile act.

144.   If Activision's current officers and directors are protected against personal liability for their breaches of fiduciary duties alleged in this complaint by Directors & Officers Liability Insurance ("D&O Insurance"), they caused the Company to purchase that insurance for their protection with corporate funds, *i.e.,* monies belonging to the shareholders.  However, Plaintiff is informed and believes that the D&O Insurance policies covering the Director Defendants in this case contain provisions that eliminate coverage for any action brought directly by Activision against the Director Defendants, known as the "insured versus insured exclusion."

145.   As a result, if the members of Activision's Board were to sue themselves or certain officers of Activision, there would be no D&O Insurance protection, and, thus, this is a further reason why they will not bring such a suit.  On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery.  Therefore, the members of the Board cannot be expected to file the claims asserted in this derivative lawsuit because such claims would not be covered under the Company's D&O Insurance policy.

146.   Under the factual circumstances described herein, the Director Defendants are more interested in protecting themselves than they are in protecting Activision by prosecuting this action.  Therefore, demand on Activision and its Board is futile and is excused.

147.   Activision has been, and will continue to be, exposed to significant losses due to the Individual Defendants' wrongdoing.  Yet, the Director Defendants have not filed any lawsuits against themselves or others who were responsible for the wrongful conduct.  Thus, the Director Defendants are breaching their fiduciary duties to the Company and face a sufficiently substantial likelihood of liability for their breaches, rendering any demand upon them futile.

148.   Plaintiff has not made any demand on shareholders of Activision to institute this action since such demand would be a futile and useless act for the following reasons:

a.     Activision is a publicly traded company with thousands of shareholders of record and at least hundreds of thousands of beneficial owners;

b.     making demand on such a number of shareholders would be impossible for Plaintiff, who has no means of collecting the names, addresses, or phone numbers of Activision shareholders; and

c.     making demand on all shareholders would force Plaintiff to incur excessive expenses and obstacles, assuming all shareholders could even be individually identified with any degree of certainty.

## COUNT I

### Derivatively For Contribution Under Sections 10(B) And 21D
### Of The Exchange Act Against The Securities Class Action Defendants

149.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

150.   This claim is brought derivatively on behalf of the Company for contribution and indemnification against Defendants Kotick, Neumann, and Johnson (the "Securities Class Action Defendants"), each of whom is a named defendant in the Securities Class Action.

151.   Activision is named as a defendant in the Securities Class Action, asserting claims under the federal securities laws for, *inter alia*, violations of Sections 10(b), 20(a) of the Exchange Act and Sections 11, 12(a)(2), and 15 of the Securities Act.  If Activision is ultimately found liable for violating the federal securities laws, the Company's liability will arise, in whole or in part, from the intentional, knowing, or reckless acts or omission of some or all of the Securities Class Action Defendants as alleged herein.   The Company is entitled to receive contribution from those Defendants in connection with the Securities Class Action against the Company.

152.    As directors and officers of Activision, the Securities Class Action Defendants had the power and/or ability to, and did, directly or indirectly control or influence the Company's business operations and financial affairs, including the content of public statements about Activision, and had the power and/or ability directly or indirectly to control or influence the specific corporate statements and conduct that violated section 10(b) of the Exchange Act and SEC Rule 10b-5 as alleged above.

153.    The Securities Class Action Defendants are also liable under 15 U.S.C. § 78j(b), pursuant to which there is a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4, which governs the application of any private right of action for contribution asserted pursuant to the Exchange Act.

154.    Accordingly, Activision is entitled to all appropriate contribution or indemnification from the Securities Class Action Defendants, who are responsible for exposing Activision to liability under the federal securities laws.

## COUNT II

### Against The Individual Defendants For Breach Of Fiduciary Duty For Disseminating False And Misleading Information

155.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

156.    As alleged in detail herein, each of the Individual Defendants had a duty to ensure that Activision disseminated accurate, truthful, and complete information to its shareholders.

157.    The Individual Defendants violated their fiduciary duties of loyalty, good faith, and candor by causing or allowing the Company to disseminate to Activision shareholders materially misleading and inaccurate information through, *inter alia*, SEC filings, press releases, conference calls, and other public statements and

1   disclosures as detailed herein.  These actions could not have been a good faith exercise

2   of prudent business judgment.

3       158.   As a direct and proximate result of the Individual Defendants' foregoing

4   breaches of fiduciary duties, the Company has suffered significant damages, as alleged

5   herein.

6   **COUNT III**

7   **Against The Individual Defendants For**
**Violations Of Section 29(B) Of The Exchange Act**

8

9       159.   Plaintiff incorporates by reference and realleges each and every allegation

10   set forth above, as though fully set forth herein.

11       160.   As a result of their conduct, as alleged in this Complaint, the Individual

12   Defendants violated Section 10(b) of the Exchange Act during the time that they

13   entered into contracts with Activision regarding their compensation.

14       161.   If Activision were to attempt to recover compensation from the Individual

15   Defendants, these Defendants might assert a breach of contract claim and/or seek

16   severance payments.

17       162.   Section 29(b) of the Exchange Act provides equitable remedies that

18   include, among other things, provisions allowing for the voiding of contracts where the

19   performance of the contract involved violation of any provision of the Exchange Act.

20       163.   The Individual Defendants violated provisions of the Exchange Act while

21   performing their duties arising under various employment and other contracts they

22   entered into with Activision.

23       164.   Activision was, and is, an innocent party with respect to the Exchange Act

24   violations of the Individual Defendants.

25       165.   Plaintiff, on behalf of Activision, seeks rescission of the contracts between

26   Activision and the Individual Defendants due to these Defendants' violations of the

27   Exchange Act while performing their job duties.

28

38

166.   Even if the contracts are not rescinded by the Court as a result of the Exchange Act violations of the Individual Defendants, the Court can and should award equitable remedies in the form of injunctive relief barring these Defendants from asserting breach of contract by Activision in any action by Plaintiff on behalf of Activision to return compensation from these Defendants.

167.   Plaintiff seeks only declaratory, injunctive, and equitable relief in this claim.

## COUNT IV

### Against All Individual Defendants For Abuse Of Control

168.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

169.   Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Activision, for which they are legally responsible.

170.   As a direct and proximate result of Defendants' abuse of control, Activision has sustained significant damages.  As a direct and proximate result of Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Activision has sustained, and continues to sustain, significant damages.  As a result of the misconduct alleged herein, Defendants are liable to the Company.

## COUNT V

### Against All Individual Defendants For Gross Mismanagement

171.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

172.   The Individual Defendants each owed, and owes, a duty to Activision and its shareholders to, in good faith, supervise, manage, and control its operations.

173.   The Individual Defendants, by their actions or inactions, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and duties with regard to operating the business and affairs of Activision.

174.   As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duties alleged herein, Activision has sustained, and continues to sustain, significant damages and injuries.

175.   As a result of the misconduct and breaches of duties alleged in this Complaint, the Individual Defendants are liable to the Company.

176.   Plaintiff on behalf of Activision has no adequate remedy at law.

## COUNT VI

### Against All Individual Defendants For Waste Of Corporate Assets

177.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

178.   The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and ongoing throughout the Relevant Period.   It resulted in continuous, connected, and ongoing harm to the Company.

179.   As a result of the misconduct described above, the Individual Defendants wasted corporate assets by: (i) by paying excessive compensation, bonuses, and termination payments to certain of its executive officers; (ii) awarding self-interested stock options to certain officers and directors; and (iii) incurring potentially millions of dollars of legal liability and/or legal costs to defend defendants' unlawful actions.

180.   As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

181.   Plaintiff, on behalf of Activision, has no adequate remedy at law.

## COUNT VII

### Against All Individual Defendants For Unjust Enrichment

182.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

183.   By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Activision.

184.   The Individual Defendants were unjustly enriched as a result of the compensation they received while breaching their fiduciary duties owed to Activision.

185.   Plaintiff, as a shareholder and representative of Activision, seeks restitution from the Individual Defendants, and seeks an order from this Court disgorging all profits, benefits, and other compensation obtained by the Individual Defendants from their wrongful conduct and fiduciary breaches.

186.   Plaintiff, on behalf of Activision, has no adequate remedy at law.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment as follows:

A.   Declaring that Plaintiff may maintain this derivative action on behalf of Activision and that Plaintiff is a proper and adequate representative of the Company;

B.   Against Defendants, and in favor of the Company, for the amount of damages sustained by the Company as a result of Defendants' breaches of fiduciary duties;

C.   Directing Activision to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable law, and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation, taking such other action as may be necessary to place before shareholders for a vote a proposal to strengthen the Board's supervision of operations, and developing and implementing procedures for greater shareholder input into the policies and guidelines of the Board;

D.   Awarding to Activision restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the Defendants;

E.   Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

1    F.    Granting such other and further relief as the Court deems just and proper.

2    **JURY TRIAL DEMANDED**

3    Plaintiff demands a trial by jury.

4                              Respectfully submitted,

5    DATED:  February 13, 2020        JOHNSON FISTEL, LLP

6                              */s/ Brett M. Middleton*
                               BRETT M. MIDDLETON
7
                               FRANK J. JOHNSON
8                              KRISTEN L. O'CONNOR
                               655 West Broadway, Suite 1400
9                              San Diego, CA  92101
                               Telephone: (619) 230-0063
10                             Facsimile: (619) 255-1856
                               FrankJ@johnsonfistel.com
11                             BrettM@johnsonfistel.com
                               KristenO@johnsonfistel.com
12
                               Attorneys for Plaintiff
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## <u>VERIFICATION</u>

I, Sonny McPherson, verify that I have reviewed the foregoing Amended

Verified Shareholder Derivative Complaint, and that the allegations as to me are true

and correct and that the other allegations upon information and belief are true and

correct.

Dated: February 7, 2020


DocuSigned by:

*Sonny McPherson*

9D145B7576F7455

Sonny McPherson